[L. A. No. 5338. Department One.—August 19, 1920.]

## J. CROUCH and G. R. CROUCH, Copartners, etc., Appellants, v. JOHN T. WILSON et al., Respondents.

[1] FRAUD—SALE OF STALLION—PLEADING—KNOWLEDGE OF FALSITY OF REPRESENTATIONS—SUFFICIENCY OF CROSS-COMPLAINT.—In an action to recover on promissory notes given for the purchase price of a stallion, a cross-complaint for fraud alleging that each and every one of the representations made by the plaintiffs was wholly and entirely false and untrue and were personally known by plaintiffs to be untrue is not open to the objection that there is no direct allegation that the representations were actually known by the plaintiffs to be untrue.

[2] ID.—FALSITY OF REPRESENTATIONS — SUFFICIENCY OF CROSS-COMPLAINT.—In such action, the cross-complaint is not open to the objection that there is no allegation showing in what respect the representations were false and fraudulent, where it is alleged, after asserting the falsity of the representations and the *scienter* of the plaintiffs, that the stallion had been in the United States for more than two years, which was known to plaintiffs, and that he had been stood and tried and had been proven to be worthless as a foal-getter.

[3] ID.—ACTION FOR PRICE—FRAUD—NONDELIVERY OF STALLION PURCHASED—SUFFICIENCY OF EVIDENCE.—In an action to recover on promissory notes given as the purchase price of a stallion, a finding of fraud set up by cross-complaint is supported by evidence that the stallion delivered was not the one purchased.

[4] ID.—GUARANTY — EXCHANGE OF STALLION — COMPLIANCE NOT ESSENTIAL TO RESCISSION.—Compliance with the terms of a guaranty providing for the exchange of the stallion for another in the event that he did not live up to its terms is not necessary to entitle the purchaser to rescission of the contract of purchase on the ground of fraud, since the guaranty was a part of the contract.

[5] ID.—RESCISSION OF CONTRACT OF PURCHASE — OFFER TO RETURN STALLION—INSUFFICIENCY OF EVIDENCE.—In an action to recover on promissory notes given for the purchase price of a stallion, the defendants are not entitled to a rescission of the contract of purchase under their cross-complaint alleging fraud, where the evidence does not sufficiently show an offer to return the stallion.

4. Rescission of sale of animal for breeding purposes on account of fraud, note, **Ann. Cas.** 1916A, 575.

5. Duty to place other party *in statu quo* on rescinding contract, note, 30 **L. R. A.** 44.

APPEAL from a judgment of the Superior Court of Los Angeles County. John W. Shenk, Judge. Reversed.

The facts are stated in the opinion of the court.

Jones & Weller and Simms & Fulwider for Appellants.

Haas & Dunnigan for Respondents.

LAWLOR, J.—This is an appeal by the plaintiffs and cross-defendants J. Crouch and G. R. Crouch, copartners, doing business under the firm name and style of J. Crouch & Son, from a judgment in favor of the defendants and cross-complainants, John T. Wilson, J. O. Jennifer, F. L. Troxel, B. F. Ermel, and P. L. Lopez, in an action to recover upon certain promissory notes executed and delivered by the said defendants, in which action they filed a cross-complaint alleging that the notes had been given for the price of a stallion purchased from the plaintiffs and that said sale had been procured by fraudulent representations, and praying the rescission of the contract, the cancellation of the notes, and damages in the sum of $1,950.

Plaintiffs were engaged in the business of importing Percheron horses from France and selling them in this country. Their principal place of business was in the state of Indiana, but they maintained branches in various states for the purpose of the delivery to their agents and sale of the animals. In 1911 the California branch was located at Sacramento and was in charge of J. F. Campbell. Harry Kenah was the local agent of the plaintiffs at Santa Ana. After some negotiations between Kenah and the defendants, the latter formed a syndicate or association under the name of the San Fernando Horse Breeders' Association. On January 8, 1912, defendants agreed to purchase from plaintiffs a Percheron stallion named "Epinal" for the sum of $4,000, and the defendants jointly executed three promissory notes aggregating that amount, which notes are those upon which plaintiffs have brought this action. On the same day plaintiffs executed this guaranty: "We have this day sold the imported Percheron Stallion Epinal No. 65631 to the San Fernando Horse Breeders' Association, . . . and we guarantee the said stallion to be a satisfactory, sure breeder, provided

CLXXXIII—37

the said stallion keeps in as sound and healthy condition as he now is and has proper care and exercise. If the said stallion should fail to be a satisfactory, sure breeder with the above treatment, we agree to take the said stallion back, and the said Horse Company agrees to accept another imported draft stallion of equal value in his place, the said stallion . . . to be returned to us at Sacramento, California, in as sound and healthy condition as he is now by April 1, 1913.'' Defendants admitted the execution, delivery, and nonpayment of the notes and filed a cross-complaint, alleging that the plaintiffs represented to them that the stallion was valuable for breeding purposes; that he was a thoroughbred Percheron stallion, registered and bred in France and known as ''Epinal''; that to the personal knowledge of plaintiffs he had been stood and proven to be a sure ''foal-getter'' in France; that he had never been stood in the United States; and that he had just been imported and brought ''practically direct'' to California. The cross-complaint further alleged that such representations were made to induce defendants to purchase the stallion; that the defendants relied solely on these statements and were induced thereby to purchase him; that each of the representations was false and was known to the plaintiffs to be false; that defendants did not discover the stallion was not a sure breeder until July, 1912, and did not discover he had been stood in this country and proven worthless, or that he had been in this country for two years prior to the sale, until December, 1912, and that in July, 1912, and continuously thereafter until February, 1913, defendants repeatedly requested plaintiffs to rescind the contract and to accept the return of the stallion. The cause was tried by the court without a jury. The court found that each of the alleged misrepresentations had been made by Kenah as agent for the plaintiffs; that all of the representations were known by Kenah to be false, and were made for the purpose of inducing defendants to purchase the stallion; that in fact the stallion had been in the United States for more than two years; that he had been tried as a ''foal-getter'' and had been proven to be totally barren and worthless for such purposes; that defendants ''had repeatedly requested the plaintiffs to rescind said contract and to accept the return of said stallion''; that ''plaintiffs at all times refused to rescind said transaction or to accept the return of

said stallion''; and that the horse was not worth the sum of four thousand dollars or any sum in excess of two hundred dollars. The judgment was that neither the plaintiffs nor the defendants take anything by the action. It is from this judgment that the plaintiffs appeal.

Appellants contend (1) that the cross-complaint lacks certain necessary averments to state a cause of action for rescission; (2) that the cross-complaint is insufficient in that the defendants, having elected to rescind the contract, ''are bound by their election, . . . and cannot now stand upon any claim for damages''; (3) that ''the evidence was wholly insufficient to support the findings of the court as to fraud at the inception of the contract''; (4) that, inasmuch as the guaranty provided, in the event ''Epinal'' should not prove to ''live up'' to the terms of the guaranty, that plaintiffs should exchange the stallion for another, ''the defendants . . . must abide by its terms and be bound by the remedy which it provides for a breach''; and (5) that ''there is in the correspondence [between the parties] . . . no expression of intention . . . to rescind the contract of sale, no offer to return the horse.''

1. As to the alleged defects in the cross-complaint. The transcript on appeal was prepared in typewriting as provided in sections 953a, 953b, and 953c of the Code of Civil Procedure. Appellants did not print in their opening brief any portion of the pleadings. (Section 953c.) Respondents called attention to this omission and now claim that the sufficiency of the cross-complaint should not be considered. Their brief was filed subsequently to the amendment of section 953c (Stats. 1919, p. 261), of which no notice was taken, and the appellants have not replied. We have, however, examined the transcript. The position of appellants is, first, that ''primarily there is no direct allegation that the representations were actually known by the plaintiffs to be untrue.'' Paragraph VI of the amended answer and cross-complaint alleges ''that each and every one of the representations so made . . . by the said J. Crouch & Son . . . was wholly and entirely false and untrue, and were . . . personally known by the said plaintiffs . . . to be untrue.'' [1] The cross-complaint is not open to the objection urged.

Appellants also claim, ''nor is there any allegation in the cross-complaint showing in what respect such representations

were false or fraudulent." But paragraph VI, after alleging the falsity of the representations and the *scienter* of the plaintiffs, also states "that in truth and fact the said stallion had been in the United States for more than two years, and that the said fact was then and there well known to the said plaintiffs, and that in truth and fact the said stallion had prior thereto been stood and tried as a 'colt-getter,' or breeding stallion in the United States and had been proven and demonstrated by actual experience that he was totally barren and utterly worthless for said purposes." **[2]** It plainly appears from these allegations in what respect the representations made by Kenah on behalf of appellants were false.

2. Appellants' contention that defendants "cannot now stand upon any claim for damages" is disposed of by the judgment that neither party take anything by the action. No judgment for damages was rendered.

3. We now turn to a discussion of appellants' claim that the findings of fraud are not supported by the evidence. At the trial, respondents undertook to prove that appellants did not deliver to them the registered Percheron stallion "Epinal," but that instead appellants delivered to them a gray Percheron stallion registered under the name of "Francinette," which had been formerly owned by McLaughlin Brothers, a firm in Oakland and competitors of appellants, and which had, several years before, been stood in Los Angeles and found worthless for breeding purposes. On this point respondent Wilson testified: "He [the stallion] has turned whiter; as he grows older he turns white. He is not quite as fleshy as he was a couple of months ago; he weighs a couple of hundred or one hundred and fifty pounds less. . . . When we purchased him he was a dapple gray horse, and he has faded out considerably now and has turned gray. . . . Q. What is the difference between the appearance of that quarter crack [in the hoof of the stallion] as it now exists compared with when you first saw the horse? A. It is practically the same. . . . Q. Was there any evidence of his having suffered a recent injury at the time you bought the horse? A. No, sir. . . . I regarded it as an injury the colt had sustained when it was very young." W. S. Magill, a veterinary surgeon, testified that he had known the stallion which was delivered to respondents for four years; that when

he first saw him he was a "dark, dapple gray. He is now gray, not a white, but a gray changing to white. The process has been gradual. . . . The deformity was a depression in the left front hoof caused by a crush received in some manner when he was very young, a colt or a foal, perhaps. It was not a wire cut or a quarter crack. . . . A groove in the hoof. It come from an injury from a crush. . . . And the other deformity in the hind leg, that would come from colthood, too, from being foaled. . . . Both of these were that way when he was foaled."

W. J. Crouch admitted that he had not noticed any quarter crack or depression in the hoof of the stallion, "Epinal"; that no such deformity existed in the horse appellants had purchased in France.

George W. McElroy testified that he was engaged in farming in Illinois; that in 1908 he had purchased from appellants a gray Percheron stallion named "Epinal"; that he kept the horse three years; that during that time "Epinal" was a satisfactory and sure colt-getter"; and that he had no quarter crack or groove in his hoof.

L. Goodin testified that he lived in Los Angeles and had been breeding stallions in California for more than thirty years; that he had examined the stallion delivered to respondents; that he had seen him in 1911 and had had charge of him at that time; that this stallion was then known as "Francinette"; that he was positive this was the same horse; that "Francinette" had been stood repeatedly but had failed to beget any colts; and that in September or October, 1911, he had been returned to McLaughlin Brothers of Oakland.

L. A. Lanning, one of the owners of the stallion, "Francinette," testified that the stallion in possession of the respondents was the same horse that he had bought under the name of "Francinette" on April 29, 1911, and had kept about five or six months; that "he was a horse when we bought him in the neighborhood of 2,140 pounds, but he is much whiter now than he was then, and he is much thinner than he was then. . . . He has a quarter crack on his left front forefoot, had when we had him. . . . He is a kind of a peculiar horse in his going, in his travel; when we shipped him to Oakland, I led him down behind the wagon to the depot, and he is a horse that you cannot walk him, he is a horse that will trot, and I led him yesterday

from my place to Doctor Connolly's, and it is the same horse, exactly.''

Guy Goodin and L. E. Wood corroborated the testimony of L. A. Lanning.

Appellants introduced evidence tending to show that the Percheron stallion ''Epinal'' was purchased in France and shipped by them to Indiana; that he was subsequently sold and delivered in 1908 to McElroy, who stood him and bred him satisfactorily for three years; that, upon McElroy's trading him back to appellants, he was shipped to California in the latter part of 1911 and sold to respondents in 1912. It is unnecessary to refer to the remainder of the evidence introduced by appellants further than to say that it created a conflict. [3] It clearly appears that the evidence is sufficient to sustain the findings.

4. We shall next consider appellants' contention that the respondents did not rescind in accordance with the terms of the contract. In this connection appellants take the position that, ''the representations being in regard to matters relating to his previous record and ability, they could not be held to change or modify the express contract which followed, and which contained a more positive assertion of his present capacity.'' *Union Investment Co.* v. *Rosenzweig,* 79 Wash. 112, [139 Pac. 874], was a similar action. We quote from the opinion: ''On the delivery of each of the horses, the vendors sent to the vendees a writing guaranteeing that the stallion described therein 'would get sixty per cent of the producing mares with foal, with proper care and handling,' and, if he did not do so, that they would replace him with another stallion of the same breed and price. The writing also contained the further provision to the effect that the foregoing was the only contract, guarantee, or representation made by the vendors. . . . The appellant contends that the remedy of the respondents was confined to the terms of this bill of sale or guaranty, and that they cannot be heard to urge any defense to the note itself. But the defense to the note was fraud in its inception, and, because of the fraud, a want of consideration for the note; and clearly, under this defense, the respondents were entitled to show the worthless character of the horses for the purposes for which they were purchased, notwithstanding the terms of the guaranty may have included another remedy. In other words,

the guaranty was accepted upon the theory that the vendors of the horses were acting honestly and in good faith, and, when the respondents discovered otherwise, they could lawfully repudiate the transaction." [4] We think that the discussion in that case is plainly applicable to the facts herein. The guaranty was part of the contract which the respondents here seek to rescind. To say that they must comply with the terms of the guaranty in order to have their remedy for the alleged fraud, is, in effect, to take the position that the respondents are bound by the very contract which they seek to avoid. Such a position cannot be upheld. Appellants cite on this point the case of *First Nat. Bank* v. *Hughes,* 5 Cal. Unrep. 454, [46 Pac. 272]. But in that case the ground of the attempted rescission was the breach of a warranty, and it was held, in accordance with section 1786 of the Civil Code, that the breach of a warranty did not entitle the buyer to rescind an executed sale. There was no allegation or proof of fraud in that case. Here, the ground of rescission is the fraudulent representations of the appellants. As we have seen, the court found that the whole transaction was fraudulent. The misrepresentations were made to induce the respondents to enter into the contract and to accept the guaranty. The guaranty must, therefore, be regarded as part of the scheme to defraud and deceive respondents. The object of reducing contracts to writing is to prevent, not to promote or protect fraud.

5. We shall next consider appellants' final contention. The court found, as above shown, that the respondents offered to return the stallion but that appellants had refused to accept it. This presents the question whether this finding is supported by the evidence. The correspondence to which appellants refer consists of three letters. On June 28, 1912, respondent Ermel wrote to Campbell: "We regret to advise you that we have learned that the gray stallion 'Epinal' No. 63631 is not as he was represented to us. We have discovered that he is a barren horse and must ask that you come down here at your earliest convenience and straighten the matter out." Campbell replied on July 9th, stating that, as far as he knew, the horse was "just as he was represented to be," and asking Ermel "to take the matter up with J. Crouch & Son." Accordingly, Ermel wrote to appellants under date of July 13th, inclosing a copy of Campbell's let-

ter—"the horse is entirely unsatisfactory and not as represented, and we would like to have the matter adjusted at once." To this appellants replied on July 17th that they were prepared "to live up to the guaranty to the letter"; that they were "much surprised that he [the horse] has not proven satisfactory." On August 7th Joseph P. Keogh, respondents' attorney, wrote to Campbell that respondents had been led to believe that the stallion delivered to them by appellants was not "Epinal," but "a horse that was sold to some other people in this section of the country, and was returned by them . . . to McLaughlin Bros., . . . as a barren horse and utterly worthless for the purpose for which it was sold. . . . Will you kindly advise me by return mail whether or not you will adjust this matter with my clients and return to them the notes they signed? If this matter is not adjusted satisfactorily by the nineteenth day of this month, I shall advise my clients to institute suit to rescind the contract, on the ground of fraud and to recover the damages which they have sustained to date." No other evidence was received to prove an offer to return the stallion. It is true that at the trial it was stipulated by appellants that Ermel, who could not be present in court, "would testify that he . . . personally offered to return to the plaintiffs the said stallion; . . . and that the said plaintiffs refused to accept said return." But it appears that the "offer" to which Ermel "would testify" was contained in his letters to Campbell and to the appellants, which we have just quoted. According to the findings the stallion was not worth "any sum in excess of two hundred dollars." This amounts to a finding that the horse had a value of two hundred dollars. It was incumbent upon the respondents, seeking rescission of their contract of purchase to allege *and prove* that they had returned, or offered to return, to appellants everything of value which they had received under the contract. (Civ. Code, sec. 1691; *Gifford* v. *Carvill,* 29 Cal. 589, 593; *Gamble* v. *Tripp,* 99 Cal. 223, 226, [33 Pac. 851]; *Kelley* v. *Owens,* 120 Cal. 502, [47 Pac. 369, 52 Pac. 797].) This was not done. The letters from Ermel to appellants and their agent contain no offer to return the stallion, but only an expression of dissatisfaction with the procreative qualities of the horse, a statement that respondents believed fraud had been perpetrated upon them, and a request for

an "adjustment" of the matter.  [5]  In our opinion appellants' contention that the evidence does not support the finding that respondents offered to return the stallion must be sustained.  It follows that respondents have failed to prove one of the essentials of rescission, and, upon that theory of the case, the judgment that plaintiffs take nothing cannot be upheld.  It is alleged, however, in paragraph 1 of the answer that the notes sued upon herein were given "wholly and entirely without consideration."  The findings of fraud, already set forth, and the particular finding as to the value of the stallion, show that there was a failure of consideration for the notes, except to the extent of two hundred dollars.

The judgment is reversed with directions to the court below to enter judgment on the findings in favor of the plaintiffs for two hundred dollars. without costs, and that defendants take nothing by the action.  It is further ordered that respondents recover of appellants their costs of appeal.

Shaw, J., and Olney, J., concurred.